## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ACUSHNET COMPANY,<br><br>                              Plaintiff,<br><br>            v.<br><br>CHECKSAMMY INC., ECO+<br>RECYCLING SERVICES, LLC, TED<br>LAMBERT, YASEEN ABDELGHANI,<br>and JOHN DOES 1 – 10,<br><br>                              Defendants. | **CIVIL NO. _____**<br><br>**JURY DEMANDED** |

## COMPLAINT

Plaintiff Acushnet Company ("Plaintiff" or "Acushnet") states its complaint for trademark infringement and counterfeiting, unfair competition, trademark dilution, unfair and deceptive trade practices, fraud, and breach of contract arising under federal and state law against CheckSammy Inc. ("CheckSammy"), Eco+ Recycling Services, LLC ("Eco+"), Ted Lambert ("Lambert"), Yaseen Abdelghani ("Abdelghani"), and John Does 1–10 (collectively, "Defendants," and each a "Defendant"), as follows:

## NATURE OF ACTION

1.     Acushnet is the owner of the world-famous TITLEIST brand of performance-driven golf products. On or around February 12, 2025, Acushnet contracted with CheckSammy to have approximately sixty (60) pallets of stale TITLEIST-branded apparel and other merchandise destroyed or recycled. CheckSammy, through its subcontractor Eco+, picked up the materials from Acushnet, invoiced Acushnet for their destruction, and delivered a "Certificate of Destruction" to Acushnet. Yet weeks later, pallets of the purportedly destroyed TITLEIST-branded products appeared for sale on Facebook Marketplace, offered by Lambert. An Acushnet employee made a

clandestine visit to the Eco+ facility where the goods were being offered for sale, and confirmed that they were the goods that had been purportedly destroyed. Acushnet promptly alerted CheckSammy, Eco+, and Lambert, and demanded the return of the purportedly destroyed product. Instead of complying, Eco+ and Lambert lied and obstructed, admitting to having sold some of the branded merchandise to a buyer in New Jersey and informing CheckSammy and Acushnet that the remaining product had subsequently been destroyed, and providing an invoice and receipt confirming the destruction. When Acushnet personnel visited the transfer station in Raynham, Massachusetts where the product had supposedly been destroyed to confirm Lambert's story, surveillance video revealed that Eco+ had <u>not</u> delivered any of the TITLEIST-branded product to that trash facility. Even now, Acushnet has been unable to locate any of the product that was purportedly destroyed—even as offers to sell the merchandise are proliferating on Facebook Marketplace, eBay, and possibly elsewhere.

2.      Mr. Lambert appears to have sold some of the TITLEIST-branded merchandise to Mr. Yaseen Abdelghani. Mr. Abdelghani, despite being in possession of goods that he obviously had no good-faith basis to possess, has yet to return the goods despite demand being made to do so.

## **PARTIES**

3.      Acushnet is a corporation organized under the laws of Delaware, having its office and principal place of business at 333 Bridge Street, Fairhaven, Massachusetts 02719.

4.      Defendant CheckSammy Inc. (a/k/a CheckSammy Technologies, Inc.) is a Delaware for-profit corporation with principal place of business located in Addison, Texas.

#18057824v3

5.      Based upon a search of the Massachusetts Secretary of State's website, neither CheckSammy nor any affiliate bearing the name "CheckSammy" appears to be registered to conduct business in Massachusetts.

6.      Defendant Eco+ Recycling Services is a domestic limited liability company with principal place of business at 131 Morse Street in Foxborough, Massachusetts.

7.      Defendant Ted Lambert is a natural person that, upon information and belief, resides in North Easton, Massachusetts. Upon information and belief, Mr. Lambert is an owner and/or officer of Eco+, or otherwise possesses authority to act on behalf of Eco+.

8.      Defendant Yaseen Abdelghani is a natural person that, upon information and belief, resides in Wayne, New Jersey.

9.      Defendants John Doe 1–10 are sued herein under fictitious names because their true names and capacities are unknown at this time. This Complaint will be amended when their true names and capacities are ascertained.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331. In addition, this Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

11.     This Court has personal jurisdiction over each Defendant because each Defendant committed tortious acts in Massachusetts or directed at Massachusetts that caused Acushnet to suffer injuries in Massachusetts.

12.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**ACUSHNET'S ACTIVITIES AND ITS TITLEIST TRADEMARK**

13.     Acushnet is a global leader in the design, development, manufacture, and distribution of exceedingly high-quality, premium, performance-driven golf products that are sold under numerous, world-famous, federally registered trademarks, including the mark TITLEIST.

14.     For more than 90 years, Acushnet and its predecessors have continuously used the iconic TITLEIST trademark shown below in commerce for a wide range of golf equipment and gear, including golf balls, golf clubs, bags, golf gloves, and golf club head covers, and have used the mark for more than 55 years on clothing and headwear:

*Titleist*

15.     Acushnet's TITLEIST products are sold through premium golf shops and golf specialty retailers, certain qualified sporting goods retailers, and direct to consumers via authorized e-commerce websites. This distribution and sales network is carefully vetted to ensure that Acushnet maintains control over the quality of the products sold under the TITLEIST mark, as well as to ensure that the customers' purchasing experience is consistent with the brand and its exceedingly high reputation.

16.     Acushnet spends considerable amounts of money every year in advertising and promoting its TITLEIST products throughout the United States and the world.

17.     TITLEIST is the brand of choice among numerous male and female professional golf players.  Currently, there are more than 1,000 professional golf players worldwide that use TITLEIST products.

4

18.     Acushnet's continuous widespread promotion and use of the TITLEIST trademark—since as early as 1933—has led it to become the top brand in the sport of golf. In 2023 alone, Acushnet had more than $761 million in sales of TITLEIST-branded golf balls, over $650 million in sales of TITLEIST-branded golf clubs, and more than $215 million in sales of other TITLEIST-branded golf gear, such as bags, headwear, gloves, and head covers. Approximately 60% of its global sales were in the United States.

19.     TITLEIST golf balls have been played by more professional players on the U.S. Professional Golf Association Tour than all other brands of golf balls combined. Acushnet's famed TITLEIST PRO V1 golf ball has been the top-selling golf ball in the market since its launch in 2000. TITLEIST is and has been the #1 ball played at the U.S. Open for 75 consecutive years. On the 2023 worldwide professional tours, TITLEIST golf balls account for 73% of all golf balls used, over seven times more than the nearest competitor.

20.     Acushnet owns the following federal registrations for the TITLEIST trademark:

| Trademark | Reg. No. | Goods | Date of First Use |
|---|---|---|---|
| TITLEIST | 316118 | golf balls | December 1933 |
| TITLEIST | 934406 | golf equipment comprising golf balls, golf clubs, golf bags, golf gloves and golf headcovers | December 1933 |
| TITLEIST | 933271 | clothing, more specifically, sweaters, shirts, and jackets | January 1970 |
| TITLEIST | 3176825 | headwear | January 1970 |
| *Titleist* | 1155766 | golf equipment-namely, golf balls, golf clubs and golf bags | December 1933 |
| *Titleist* | 1273662 | clothing-namely, shirts | January 1970 |
| *Titleist* #1 ball in golf. | 1601034 | golf balls | 1978 |

True and correct printouts from the United States Patent and Trademark Office database showing the current ownership and status of these registrations are attached to this Complaint as **Exhibit A**.

21.    The foregoing trademark registrations are valid and subsisting and, except for Reg. No. 933271, incontestable. Pursuant to 15 U.S.C. §§ 1065 and 1115(b), these incontestable registrations constitute conclusive evidence of Acushnet's exclusive right to use the marks shown in these registrations, in connection with the goods identified therein, while Reg. No. 933271 constitutes prima facie evidence of Acushnet's exclusive right to use the mark shown therein for the identified goods. 15 U.S.C. § 1057(b).

22.    By virtue of its long and extensive use, its substantial promotional and marketing efforts, and its strong sales of and revenues from the sale of its TITLEIST-branded products, Acushnet has established enormous goodwill and recognition and valuable trademark rights in the TITLEIST trademark.  Moreover, the TITLEIST trademark is and has long been widely recognized by the general consuming public as the designation of source of the goods offered and provided by Acushnet.

23.    By virtue of the inherent strength and acquired distinctiveness of the TITLEIST mark as applied to Acushnet's goods, the extensive worldwide use and promotion of the TITLEIST mark by Acushnet, the strong and sustained commercial success of the products sold under the TITLEIST mark, and the federal registrations for the TITLEIST mark on the Principal Register, the TITLEIST mark has long become famous.

## FACTS COMMON TO ALL COUNTS

24.    In early 2025, Acushnet held roughly sixty (60) pallets of aged, unsold apparel and accessories bearing the TITLEIST mark, including baseball hats, "Aussie" hats, golf towels, knit hats, visors, and neck warmers, that had been removed from sale (the "Unauthorized Goods").

#18057824v3

25.     Acushnet, consistent with industry practices, carefully monitors the rate of sale of its inventory. This unsold inventory had been available for sale for an extended period at a reduced price, but had not sold. Selling the product at an even more reduced price would damage the premium nature of the TITLEIST mark, and Acushnet made the business decision to have the Unauthorized Goods recycled or otherwise destroyed.

26.     Acushnet contracted with CheckSammy, which it had used in the past for waste disposal, to have the pallets of Unauthorized Goods picked up from Acushnet's warehouse at 175 Kenneth Welch Drive in Lakeville, Massachusetts to be sustainably recycled.

27.     CheckSammy offers bulk waste removal services on a nationwide basis and, on its website, markets itself as the world's largest bulk waste and sustainability operator.

28.     Upon information and belief, CheckSammy does not itself remove waste from customers, but instead contracts with local vendors to perform the actual removal and disposal of waste from CheckSammy customers.

29.     CheckSammy arranged for the pallets of Unauthorized Goods to be picked up on or around February 12, 2025, which occurred.

30.     Though CheckSammy did not inform Acushnet that it was using a local vendor, nor identify the local vendor, the Unauthorized Goods were in fact picked up by Eco+.

#18057824v3

31.     After Eco+ removed the Unauthorized Goods from Acushnet's possession, CheckSammy delivered the following Certificate of Destruction to Acushnet:



32.     However, during the last week of March of 2025, personnel from Acushnet were notified that pallets of the Unauthorized Goods were being offered for sale on Facebook Marketplace, cross-posted from several locations in Massachusetts including Westport, Foxborough, and New Bedford, by an individual identified as Ted Lambert.

33.     A true and correct screenshot (taken April 1, 2025) of a Facebook Marketplace posting offering the Unauthorized Goods is shown below:



34.     Ted Lambert, upon information and belief, is an owner or manager of Eco+.

#18057824v3

35.     Mr. Lambert offered pallets of Unauthorized Goods that he valued at "over $10,000" per pallet, for a price of $700 per pallet.

36.     On or around March 27, 2025, Lisa Rogan, Director of Trademark and Brand Protection at Acushnet, contacted Ted Lambert via Facebook Messenger regarding the pallets of Unauthorized Goods that he was offering for sale on Facebook Marketplace.

37.     Ms. Rogan expressed interest in purchasing the pallets that Mr. Lambert was offering for sale, but did not identify herself as affiliated with Acushnet.

38.     Mr. Lambert provided his cell phone number and the two continued to communicate via text message. Mr. Lambert indicated that he had several pallets of TITLEIST-branded products available for sale.

39.     Mr. Lambert agreed to have his confederates "Coleman" and "Evan" meet Ms. Rogan on Saturday, March 29, at a warehouse located at 300 R Tosca Way in Stoughton, Massachusetts, for her to examine the merchandise and determine whether she wanted to purchase any of it.

40.     Upon information and belief, the warehouse located at 300 R Tosca Way in Stoughton is an Eco+ facility.

41.     Upon arrival on Saturday, March 29, at the Stoughton address provided by Mr. Lambert, Ms. Rogan was greeted by a man identifying himself as Coleman.

42.     Coleman said that Ted Lambert was his boss.

43.     The Stoughton facility contained a large quantity of used refrigerators, which Coleman explained were being recycled for Mass Save.

#18057824v3

44.     Ms. Rogan said she was interested in purchasing TITLEIST-branded merchandise. In response, Coleman said Eco+ had 28 pallets of TITLEIST-branded product to sell. He offered full pallets for sale at $700 per pallet.

45.     Coleman further indicated that Eco+ possessed TITLEIST-branded product not only at that Stoughton location, but also at another facility located at 131 Morse Street in Foxborough.

46.     In response to the question from Ms. Rogan of how Eco+ ended up with so much TITLEIST-branded product, Coleman said that he understood that "they wanted to get rid of it."

47.     Coleman further explained that the pallets contained only apparel, rather than golf equipment, and that none of the product was damaged.

48.     Ms. Rogan took photographs of the labels on several pallets and of the product contained on the pallets, including the following:

11



49.     The labels on the pallets indicated that the product being offered for sale from the Eco+ facility in Stoughton contained the Unauthorized Goods, which CheckSammy had picked up from Acushnet on February 12, 2025, and had certified to Acushnet had been destroyed.

50.     Three days later, on Tuesday, April 1, Acushnet asked Brandon Cross, Logistics Manager for CheckSammy, which vendor had been used to destroy the Unauthorized Goods.

51.     Mr. Cross did not respond. On Thursday, April 3, Ms. Rogan emailed again, asking CheckSammy if Eco+ was the vendor used for the CheckSammy project.

52.     Mr. Cross responded on behalf of CheckSammy via email, stating (falsely) that Eco+ was not the vendor that CheckSammy had used.

53.     On Thursday, April 3, outside counsel for Acushnet delivered a letter via email and FedEx to CheckSammy demanding that CheckSammy take control of the situation and recover the

12

Unauthorized Goods, and attaching the Facebook Marketplace post shown above. This letter indicated Acushnet's expectation that CheckSammy take full responsibility for the recovery of the Unauthorized Goods. A true and correct copy of this letter is attached as **Exhibit B**.

54. Also on Thursday, April 3, outside counsel for Acushnet prepared a cease and desist letter to Eco+, which Ms. Rogan hand-delivered that same day to the main Eco+ facility in Foxborough, demanding that Eco+ stop selling the Unauthorized Goods and cooperate with CheckSammy's recovery of the Unauthorized Goods. A true and correct copy of that letter is attached as **Exhibit C**.

55. On Sunday, April 6, Dorsey & Whitney, outside counsel for CheckSammy, contacted outside counsel to Acushnet in response to the April 3 letter and explained that CheckSammy was working to recover the Unauthorized Goods.

56. On Wednesday, April 9, CheckSammy's outside counsel updated Acushnet on CheckSammy's attempts to recover the Unauthorized Goods. CheckSammy indicated that Ted Lambert had sold approximately twelve (12) of the pallets of Unauthorized Goods to a buyer in New Jersey, and that Mr. Lambert had already destroyed the remainder of the Unauthorized Goods that were not sold to the New Jersey buyer.

57. On Thursday, April 10, CheckSammy's outside counsel provided Acushnet with documentation provided from Mr. Lambert that purportedly demonstrated the destruction on April 1, 2025 of the Unauthorized Goods that were not sold to the New Jersey buyer. A true and correct copy of the email from CheckSammy's outside counsel is attached as **Exhibit D**.

58. CheckSammy provided an invoice that Mr. Lambert purportedly received from Foxboro Clean Outs for the removal and disposal of 25 pallets of assorted apparel on April 1, 2025.

A true and correct copy of the invoice that CheckSammy provided to Acushnet is attached to this Complaint as **Exhibit E**.

59.     CheckSammy also provided a receipt that Mr. Lambert had provided from Recycling Solutions in Raynham that purportedly showed the delivery of the Unauthorized Goods to Recycling Solutions' transfer station at 35 Thrasher Street on April 1, 2025 at 10:33 a.m. A true and correct copy of the receipt that CheckSammy provided is attached to this Complaint as **Exhibit F**.

60.     On Friday, April 11, Ms. Rogan and in-house counsel to Acushnet visited Recycling Solutions' facility in Raynham to attempt to verify that 25 pallets of Unauthorized Goods had in fact been disposed of there on April 1, 2025.

61.     Recycling Solutions' personnel were cooperative and provided security camera footage of the purported drop-off by Foxboro Clean Outs on the morning of April 1, 2025.

62.     The photo below, from a security camera of Recycling Solutions, shows Foxboro Clean Outs' truck arriving at approximately 10:30 a.m. on April 1. Foxboro Clean Outs' truck is the first truck shown in the photograph.



63.    This truck is far too small to carry 25 pallets of merchandise.

64.    The photo below is from a security video that captures the Foxboro Clean Outs truck dumping in one of the bays of the Recycling Solutions' transfer station. The product being dumped appears to be bags of household trash. It is certainly not pallets containing cardboard boxes of merchandise.



65.    During her site visit on April 11, Ms. Rogan showed Recycling Solutions' personnel photos of the pallets of cardboard boxes containing the merchandise, including the photo pasted in Paragraph 48 above.

66.    Recycling Solutions' personnel informed Ms. Rogan that they would never accept pallets containing cardboard boxes for disposal, as cardboard is a "restricted item" that would have to be recycled.

67.     Recycling Solutions' personnel also informed Ms. Rogan categorically that the facility at 35 Thrasher Street in Raynham does not accept textiles.

68.     The Foxboro Clean Outs invoice that Mr. Lambert provided was fraudulent.

69.     Foxboro Clean Outs did not deliver the pallets of the Unauthorized Goods to Recycling Solutions on April 1, 2025.

70.     Mr. Lambert and Eco+ lied about the destruction of the Unauthorized Goods and provided a false invoice for the purpose of hiding the continued possession of the Unauthorized Goods by Mr. Lambert and Eco+.

71.     On Thursday, April 10, outside counsel to CheckSammy informed Acushnet that the buyer of approximately twelve (12) pallets of Unauthorized Goods from Eco+ had been identified as Yaseen Abdelghany. *See* **Exhibit D**.

72.     Upon information and belief, Mr. Abdelghany resides in Wayne, New Jersey.

73.     Upon information and belief, Mr. Abdelghany responded to Mr. Lambert's Facebook Marketplace postings offering pallets of Unauthorized Goods for sale, and purchased some number of those pallets.

74.     Upon information and belief, Mr. Abdelghany, like any reasonable viewer of a Facebook Marketplace post selling premium TITLEIST-branded merchandise for a price of $700 per pallet, knew that the goods were stolen, counterfeit, or otherwise illicit.

75.     Upon information and belief, Mr. Abdelghany knew that the Unauthorized Goods that he purchased were not properly offered for sale by Mr. Lambert.

76.     Upon information and belief, Mr. Abdelghany intends to resell the Unauthorized Goods.

77.     Outside counsel for CheckSammy informed Acushnet that she was in contact with Mr. Abdelghany's attorney and that CheckSammy was negotiating a return of the Unauthorized Goods in his possession.

78.     As of the filing of this complaint, Acushnet has received no confirmation from CheckSammy that it had obtained the Unauthorized Goods from Mr. Abdelghany.

79.     Despite having the sole responsibility and obligation to ensure that the Unauthorized Goods were destroyed and not offered for illicit sale to the public, CheckSammy has failed to secure a single item of the Unauthorized Goods.

80.     Upon information and belief, Eco+, Mr. Lambert, and Mr. Abdelghany may have sold the Unauthorized Goods to John Does 1–10, who themselves may be reselling the goods in violation of Acushnet's rights.

81.     Defendants are not now, nor have they ever been, licensees of the TITLEIST trademark, or otherwise authorized in any way to use the TITLEIST trademark on or in connection with the advertising, marketing, and sale of any products.

82.     Defendants use the identical TITLEIST trademark in connection with the sale of the Unauthorized Goods, targeting the same classes of consumers to whom Acushnet markets its authorized TITLEIST products.

83.     Defendants' use of the identical TITLEIST trademark falsely suggests that the Unauthorized Goods are genuine goods that originated from, are associated with, or have been approved or authorized by Acushnet, that Defendants are authorized retailers for TITLEIST products, and that there is a connection or association between Defendants and Acushnet, when in fact the Unauthorized Goods being sold are products that Acushnet intended to destroy and have recycled.

#18057824v3

84.    By selling unauthorized, stolen TITLEIST-branded products to consumers at steeply discounted prices, Defendants have diverted sales away from Acushnet for legitimate TITLEIST goods, thereby depriving Acushnet of sales and causing it to lose customers.

85.    The Unauthorized Goods sold by Defendants are not covered by Acushnet's warranty policy, because the goods were not sold to consumers through an authorized retailer.

86.    At all relevant times and in furtherance of their counterfeiting and infringing activities, Defendants have willfully and intentionally used and continue to use Acushnet's TITLEIST trademark on and in connection with the Unauthorized Goods.

## INJURY TO ACUSHNET AND THE PUBLIC

87.    Defendants' counterfeiting and infringing acts as alleged herein have caused and are likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of the Unauthorized Goods and have deceived and are likely to deceive the relevant consuming public into believing, mistakenly, that the Unauthorized Goods originate from, are associated or affiliated with, or are otherwise authorized by Acushnet.

88.    Defendants' acts are causing, and unless restrained, will continue to cause damage and immediate irreparable harm to Acushnet and to its valuable reputation and goodwill with the consuming public for which Acushnet has no adequate remedy at law.

### COUNT I
### Counterfeiting and Trademark Infringement
### Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Against All Defendants)

89.    Plaintiff repeats and re-alleges each and every allegation set forth above.

90.    Defendants' actions described above, including its unauthorized use in commerce of a trademark that is identical to or substantially indistinguishable from Acushnet's TITLEIST trademark, on and in connection with the Unauthorized Goods as alleged herein, is likely to cause

confusion, mistake, or to deceive consumers as to the origin, source, sponsorship, approval, or affiliation of the Unauthorized Goods, and is likely to cause consumers to believe, contrary to fact, that Defendants' goods are sold, authorized, endorsed, or sponsored by Acushnet, or that Defendants are in some way affiliated with or sponsored by Acushnet. Defendants' conduct therefore constitutes trademark infringement and counterfeiting in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

91.    Defendants' actions described above have at all times relevant to this action been willful and knowing.

92.    As a direct and proximate result of Defendants' actions described above, Plaintiff has been damaged and will continue to be damaged.

**COUNT II**
**Unfair Competition, False Designation of Origin, and Misleading Statements of Fact**
**<u>Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Against All Defendants)</u>**

93.    Plaintiff repeats and re-alleges each and every allegation set forth above.

94.    Defendants' actions described above are likely to cause confusion or mistake, or to deceive, as to the origin, sponsorship, or approval of the Unauthorized Goods and other associated commercial activities, and thus constitute trademark infringement, false designation of origin, and unfair competition with respect to Plaintiff's trademark rights in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

95.    By engaging in the actions described above, Defendants have made, and continue to make, false and misleading representations of fact to consumers and potential consumers, which, in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of its products in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

96.     Defendants' actions described above have at all times relevant to this action been willful and knowing.

97.     As a direct and proximate result of Defendants' actions described above, Plaintiff has been damaged and will continue to be damaged.

## COUNT III
### Trademark Dilution
### <u>Under Section 43(c)(1) of the Lanham Act, 15 U.S.C. § 1125(c)(1) (Against All Defendants)</u>

98.     Plaintiff repeats and re-alleges each and every allegation set forth above.

99.     Defendants' actions described above, all occurring after the TITLEIST trademark became distinctive and famous, are likely to cause dilution by blurring or by tarnishment, or both, of the distinctive quality of the famous TITLEIST mark in violation of Section 43(c)(1) of the Lanham Act, 15 U.S.C. § 1125(c)(1).

100.    Defendants' actions described above have at all times relevant to this action been willful and knowing.

101.    As a direct and proximate result of Defendants' actions described above, Plaintiff has been damaged and will continue to be damaged.

## COUNT IV
### <u>Breach of Contract (Against CheckSammy)</u>

102.    Plaintiff repeats and re-alleges each and every allegation set forth above.

103.    Acushnet and CheckSammy entered into a valid and enforceable contract for the removal and destruction or recycling of the Unauthorized Goods.

104.    CheckSammy has materially breached the terms of the agreement by (i) failing to destroy or recycle the product as it was hired to do; (ii) providing a false certification that the Unauthorized Goods had been destroyed and recycled; and (iii) allowing the Unauthorized Goods to be illicitly resold.

105.    CheckSammy has issued Acushnet invoices for the removal and destruction or recycling of the Unauthorized Goods.

106.    CheckSammy has failed, without excuse or defense, to ensure that the Unauthorized Goods were destroyed or recycled and not resold.

107.    As a direct and consequential result of CheckSammy's material breaches of the agreement, Acushnet has suffered damages in an amount to be determined at trial.

**COUNT V**
**G.L. c. 93A – Unfair and Deceptive Trade Practices (Against CheckSammy)**

108.    Plaintiff repeats and re-alleges each and every allegation set forth above.

109.    At all times relevant hereto, Acushnet and CheckSammy have been engaged in trade or commerce within the meaning of G.L. c. 93A § 1 *et seq.* The relevant events herein have occurred primarily and substantially in the Commonwealth of Massachusetts.

110.    CheckSammy has willfully violated, in whole or in part, the provisions of G.L. c. 93A § 1 *et seq.*, which declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

111.    CheckSammy's provision of a false certification that the Unauthorized Goods had been destroyed, and allowing its vendor Eco+ to illicitly resell the Unauthorized Goods, constitute unfair and deceptive acts and practices in the conduct of trade or commerce in violation of M.G.L. c. 93A § 1 *et seq.*, and are actionable thereunder.

112.    As a direct and proximate result of such unfair and deceptive acts and practices, Acushnet has suffered and continues to suffer damages in an amount to be determined at trial.

113.    Acushnet is further entitled to multiple, including up to treble, damages and reasonable attorney's fees in an amount to be determined at trial.

#18057824v3

## COUNT VI
## G.L. c. 93A – Unfair and Deceptive Trade Practices
## (Against Eco+ and Lambert)

114.    Plaintiff repeats and re-alleges each and every allegation set forth above.

115.    At all times relevant hereto, Acushnet and Eco+ and Ted Lambert have been engaged in trade or commerce within the meaning of M.G.L. c. 93A § 1 *et seq.* The relevant events herein have occurred primarily and substantially in the Commonwealth of Massachusetts.

116.    Eco+ and Ted Lambert have willfully violated, in whole or in part, the provisions of M.G.L. c. 93A § 1 *et seq.*, which declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

117.    Eco+ and Ted Lambert's actions including selling the Unauthorized Goods without authorization, and falsifying receipts and invoices to mislead Plaintiff into believing the Unauthorized Goods had been destroyed, constitute unfair and deceptive acts and practices in the conduct of trade or commerce in violation of M.G.L. c. 93A § 1 *et seq.*, and are actionable thereunder.

118.    As a direct and proximate result of such unfair and deceptive acts and practices, Acushnet has suffered and continues to suffer damages in an amount to be determined at trial.

119.    Acushnet is further entitled to multiple, including up to treble, damages and reasonable attorney's fees in an amount to be determined at trial.

## COUNT VII
## Fraud (Against CheckSammy)

120.    Plaintiff repeats and re-alleges each and every allegation set forth above.

121.     Acushnet contracted with CheckSammy for the removal and destruction of the Unauthorized Goods, and CheckSammy, through its agent, picked up the Unauthorized Goods

from Acushnet and issued Acushnet invoices for the removal and destruction or recycling of the Unauthorized Goods.

122.    CheckSammy issued Acushnet a Certificate of Destruction dated February 11, 2025, certifying to Acushnet that "the materials requested for removal have been diverted in accordance with the CheckSammy Diversion/Destruction and Removal process and in compliance with all applicable laws" and that the method was "Recycling."

123.    CheckSammy's certifications that the Unauthorized Goods had been destroyed were false. Instead, the Unauthorized Goods not only still exist, but are being illicitly sold through unauthorized channels.

124.    Acushnet reasonably relied on CheckSammy's representations that the Unauthorized Goods had been destroyed or recycled.

125.    As a direct and consequential result of CheckSammy's false representations that the Unauthorized Goods had been destroyed, Acushnet has suffered, and continues to suffer, harm and seeks damages from CheckSammy in an amount to be determined at trial, including costs and attorneys' fees.

## COUNT VIII
### Fraud (Against Eco+ and Lambert)

126.    Plaintiff repeats and re-alleges each and every allegation set forth above.

127.    Acushnet contracted with CheckSammy for the removal and destruction of the Unauthorized Goods.

128.    CheckSammy, through its agent Eco+, picked up the Unauthorized Goods from Acushnet.

129.    Eco+ and Lambert did not destroy or recycle the Unauthorized Goods, instead knowingly offering them for sale illicitly.

23

130.    After Acushnet demanded that Eco+ and Lambert stop selling the Unauthorized Goods, Eco+ and Lambert provided false documentation indicating that the Unauthorized Goods had been destroyed on April 1, 2025, which did not occur.

131.    As a direct and consequential result of Eco+ and Ted Lambert's false representations, Acushnet has suffered, and continues to suffer, damages in an amount to be determined at trial, including costs and attorneys' fees.

## COUNT IX
## Unjust Enrichment (Against All Defendants)

132.    Plaintiff repeats and re-alleges each and every allegation set forth above.

133.    Acushnet conferred a benefit on Defendants by providing them with the Unauthorized Goods, which were to be recycled or destroyed, but which were instead illicitly resold.

134.    Defendants had knowledge of the benefits which Acushnet conferred on them and/or enabled them to achieve.

135.    Defendants have been unjustly enriched by their retention of the substantial benefit provided by possessing the Unauthorized Goods and from the subsequent unauthorized sale of the Unauthorized Goods.

136.    Defendants have retained the benefits which Acushnet conferred on them and/or enabled them to achieve, under circumstances which would make it inequitable for Defendants to pay their value to Acushnet and/or not to return the Unauthorized Goods to Acushnet.

137.    As a direct and proximate result of Defendants' actions, Acushnet has been harmed, and Defendants have been unjustly enriched in an amount to be determined at trial.

#18057824v3

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

A.      An Order declaring that Defendants' actions, including the sale of the Unauthorized Goods, constitute trademark infringement and counterfeiting, unfair competition, trademark dilution, unfair and deceptive trade practices, fraud, and breach of contract under federal, state, and/or common law;

B.      An injunction permanently enjoining Defendants and their employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with any of them, from selling, distributing, or otherwise offering into commerce the Unauthorized Goods;

C.      An Order requiring Defendants to surrender to Plaintiff the Unauthorized Goods;

D.      An Order requiring Defendants to alter all websites and social media under their control or direction to remove all posts regarding the Unauthorized Goods;

E.      An Order requiring Defendants to identify, by name and contact information, all buyers, holders, and others in possession, custody, or control of the Unauthorized Goods;

F.      An Order requiring Defendants to file with this Court and serve on Plaintiff's attorneys, within thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

G.      An Order requiring Defendants to pay Plaintiff compensatory damages in an amount as yet undetermined caused by the foregoing acts of trademark infringement and

counterfeiting, trademark dilution, fraud, breach of contract, unfair competition, and unfair trade practices;

H.    An Order awarding treble damages to Plaintiff, in accordance with 15 U.S.C. § 1117 and other applicable laws;

I.    An Order requiring Defendants to pay Plaintiff, at Plaintiff's election, statutory damages of $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, pursuant to Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c).

J.    An Order requiring Defendants to account for and pay to Plaintiff any and all gains, profits, and advantages derived through or arising from the foregoing acts of trademark infringement and counterfeiting, trademark dilution, unfair competition, and unfair trade practices, and trebling such profits for payment to Plaintiff, in accordance with 15 U.S.C. § 1117, and other applicable laws;

K.    Entry of an award of multiple damages as allowed by Mass. Gen. Laws ch. 93A, and fees and costs as provided under state law;

L.    An Order requiring Defendants to pay Plaintiff punitive damages in an amount as yet undetermined caused by Defendants' foregoing acts;

M.    An Order requiring Defendants to pay Plaintiff the costs of bringing this action, including reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117, G.L. c. 93A, and other applicable laws;

N.    An Order requiring Defendants to pay Plaintiff pre-judgment interest on the judgment amount; and

O.    Other relief as the Court may deem appropriate.

#18057824v3

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury of all issues so triable by a jury in this action.

DATED: April 14, 2025

Respectfully submitted,

ACUSHNET COMPANY

*/s/ Kyle M. Noonan*
Kyle M. Noonan (BBO #705713)
Jonathan M. Gelchinsky (BBO #656282)
PIERCE ATWOOD LLP
254 Commercial Street
Portland, ME  04101
(207) 791-1100
knoonan@pierceatwood.com
jgelchinsky@pierceatwood.com

#18057824v3